AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. **1:21-MJ-00235** |
| INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100055863441069 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703 (c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 875(c) | Interstate Threats |
| 18 U.S.C. 1512(b)(3) | Tampering with a Witness by Threats |

The application is based on these facts:

See attached affidavit of FBI Special Agent Caleb Yokley

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Caleb Yokley, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ FaceTime Videoconference _____ *(specify reliable electronic means)*.

Date: **Mar 19, 2021**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Stephanie K. Bowman, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100055863441069 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on **March 18, 2021**, Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities **from October 6, 2020, through January 15, 2021**;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from October 6, 2020, through January 15, 2021**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)      All other records and contents of communications and messages made or received by the user **from October 6, 2020, through January 15, 2021**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)      All "check ins" and other location information **from October 6, 2020, through January 15, 2021**;

(h)      All IP logs, including all records of the IP addresses that logged into the account **from October 6, 2020, through January 15, 2021**;

(i)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)      All information about the Facebook pages that the account is or was a "fan" of;

(k)      All past and present lists of friends created by the account;

(l)      All records of Facebook searches performed by the account **from October 6, 2020, through January 15, 2021**;

(m)      All information about the user's access and use of Facebook Marketplace **from October 6, 2020, through January 15, 2021**;

2

(n)    The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)    All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)    All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

**14 days** of issuance of this warrant.

3

**II.      Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 875(c) (Interstate Threats) and 1512(b)(3) (Intimidating a Witness by Threat) involving JUSTIN STOLL on or about January 7, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence relating to threats by JUSTIN STOLL;

(b) Communications between STOLL and the individual who was using the username "rstyree" on Clapper as of on or about January 7, 2021;

(c) Evidence relating to JUSTIN STOLL's whereabouts and activities from January 1, 2021, through January 15, 2021, including preparations to go to the U.S. Capitol and travel and activities relating to the threat made by STOLL on or about January 7, 2021;

(d) Evidence relating to any other social media accounts, passwords, or monikers used by JUSTIN STOLL;

(e) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(f) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(h) The identity of the person(s) who communicated with the user ID about matters relating to activities at the U.S. Capitol Building on or about January 6, 2021.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID 100055863441069
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

Case No. **1:21-MJ-00235**

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Caleb Yokley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for
information associated with a certain Facebook user ID that is stored at premises owned,
maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking
company headquartered in Menlo Park, California.  The information to be searched is described
in the following paragraphs and in Attachment A.  This affidavit is made in support of an
application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to
require Facebook to disclose to the government records and other information in its possession,
pertaining to the subscriber or customer associated with the user ID.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have
been since 2019. I am assigned to the Cincinnati Division's Joint Terrorism Task Force. In this
capacity, I am responsible for investigating violations of Title 18 of the United States Code and
other violations of federal law. I have conducted and participated in investigations that involved
the use of advanced investigative techniques such as: execution of search warrants on computers,
emails, other electronic devices and physical structures; physical and electronic surveillance, and

vehicles. During my investigations, I have participated in witness interviews, subject interviews, and analysis of evidentiary items. I have received specialized training in interviewing and interrogation techniques, search and seizure, and other investigative techniques.

3.      Prior to joining the FBI, I was an Assistant District Attorney (ADA) for the Knox County District Attorney's Office. As an ADA, I was primarily responsible for prosecuting criminal cases involving domestic violence and firearms offenses, as well as other misdemeanor and felony violations.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that JUSTIN STOLL has violated 18 U.S.C. §§ 875(c) (Interstate Threats) and 1512(b)(3) (Intimidating a Witness by Threat). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

**PROBABLE CAUSE**

**A.      Introduction**

6.      The Federal Bureau of Investigation and the United States Attorney's Office for the Southern District of Ohio are investigating a riot that occurred at the U.S. Capitol building on January 6, 2021, and whether individuals from this District may have traveled to Washington, D.C., with the intent to commit federal crimes.

7.      In connection with that investigation, FBI learned of a threat to injure a person that was transmitted in interstate commerce. For the reasons given below, there is probable cause to believe that JUSTIN STOLL, a resident of the Southern District of Ohio, transmitted the threat; that in doing so he violated 18 U.S.C. § 875(c) (interstate communication of threat) and 18 U.S.C. § 1512(b)(3) (tampering with a witness by threat); and that evidence of these crimes will be found in STOLL's Facebook account.

**B.      On January 6, 2021, protesters broke through police barricades at the United States Capitol.**

8.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate met in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.

9.      With the joint session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the United States Capitol. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building. U.S. Capitol Police were present and attempted to keep the crowd away from the Capitol building and the proceedings underway inside.

10.      At approximately 2:00 pm, some protesters broke through police barricades and forced their way to the exterior façade of the Capitol. At the time, the joint session was still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from

entering the Capitol; however, shortly after 2:00 pm, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows.

11. Shortly thereafter, at approximately 2:20 pm, members of the U.S. House of Representatives and U.S. Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the U.S. Congress was effectively suspended until shortly after 8:00 pm.

**C.** **A concerned citizen referred Clapper user "Th3RealHuckleberry," later identified as JUSTIN STOLL, to the FBI in connection with the riot.**

12. On January 8, 2021, the FBI National Threat Operations Center received an online tip about threatening posts made by users of the smartphone application "Clapper." The tip asserted that Clapper had been used by right-wing content creators to plan the attack on the Capitol Building on January 6, 2021. The tip added that members of Clapper had used the words "coup" and "insurrection" to describe their planned actions.

13. The tip asserted that Clapper user "Th3RealHuckleberry" had posted concerning videos about politicians. Based on my training and experience and the information described below, I believe that the user of Clapper username "Th3RealHuckleberry" is JUSTIN STOLL, a resident of the Southern District of Ohio.

14. An open-source query for Clapper username "Th3RealHuckleberry" resolved to Clapper account @Th3RealHuckleberry. @Th3RealHuckleberry's profile page showed several photos of the same person: a white male who appears to be in his late 30s or early 40s. Based on my training and experience and the context of these images, I believe that these photos show the individual who operates the account.

15.     A Facebook query for "Th3RealHuckleberry" revealed a Facebook profile page for a person identified as a "Talent/Brand Manager at Th3 Real Huckleberry." Review of the Facebook page led to the discovery of the Facebook page for an individual I will call T.S. That Facebook profile shows a woman standing with a man who appears to be the same individual shown on the profile picture for Clapper user Th3RealHuckleberry.

16.     An open-source query on T.S. led to the discovery of a listed relative named JUSTIN STOLL. A driver's license query for JUSTIN STOLL revealed an active Driver License with a DMV photo. The photo was a positive match to the user portrayed in Th3RealHuckleberry's photos and videos.

**D.     Videos show that STOLL was present with other protesters outside the United States Capitol on January 6, 2021.**

17.     On January 12, 2021, FBI Cincinnati learned of a video that had recently been posted to Th3RealHuckleberry's Clapper account. The video shows STOLL asking his viewers if he should wear a black United States flag during his trip to Washington, DC. Based on my training and experience and my review of the YouTube videos described below, I believe that STOLL was referring to the January 6, 2021, trip to the U.S. Capitol Building. STOLL then explains what the black flag means: "[N]o enemy combatants will receive aid. You will get no quarters from me. Basically, if you are an enemy combatant, you will be shot on sight….I know this is the end-all flag. This is the it's-too-late-to-give-a-shit flag."

18.     FBI agents also reviewed videos on the YouTube channel for user "Th3Real Huckleberry." The videos show a white male in a crowd of individuals gathered outside the Capitol Building in Washington, DC. Based on my review of STOLL's driver's license, and the

fact that the YouTube account username is the same as STOLL's Clapper username, I believe that the individual pictured in the videos is STOLL.

19.     The videos show STOLL outside the United States Capitol with other protestors. In one video, STOLL pans the camera around to show his face. Other YouTube videos on Th3RealHuckleberry's channel show various angles of STOLL's face throughout the day as he participates in the activities at the Capitol.

20.     In one of the videos, STOLL can be heard saying, among other things, "D.C. is a motherfucking war zone! D.C.'s a war zone! D.C.'s a war zone! . . . You ain't got enough cops, baby! We are at war at the Capitol. . . . we have taken the Capitol. This is our country."

**E.      In one video posted to Clapper, STOLL made threats toward a concerned citizen who said he/she had saved STOLL's videos relating to the Capitol.**

21.     In response to Th3Real Huckleberry's YouTube videos showing his activity at the Capitol, STOLL received online responses from other online users who claimed he should be arrested for his activity.

22.     On or about January 7, 2021, an online user with username "rstyree" posted the following comment on one of STOLL's videos:

> Cool I'm glad I saved this video lol I hope you really went in the capitol bldg. You'll have 10 years of free room and board waiting for you.

23.     Shortly thereafter, STOLL posted a video response to the online user on Clapper in which he showed a screenshot of the online user's comment and then said:

> Snitch bitch first thing in the morning. Let's see what the rat fuck has to say, shall we? Cool, I'm glad I saved this video, lol. I hope you really went into the capitol building. You'll have 10 years of free room and board waiting for you. Well, that shows your fucking ignorance because clearly, the capitol building is owned by the people, so again, nothing will happen. Secondly, I never admitted I went into it, did I? Go watch the video again. Daddy's

6

not stupid. [Wink.] Third, *if you ever in your fucking existence did something to jeopardize taking me away from my family, you will absolutely meet your maker. You can play that for the D.A. in court, I don't care. If you ever jeopardize me, from being with my family, you will absolutely meet your mother fucking maker, and I will be the one to arrange the meeting.* So go ahead and play that shit, bitch. Keep this video. You might need it one day.

24.     STOLL's demeanor in the video is serious and aggressive. Below is a screenshot from the video:



**F.      In a post-arrest interview, STOLL said that he is a social media influencer and has had to deal with "haters" online.**

25.     On January 14, 2021, STOLL was charged in a criminal complaint with Interstate Threats and Intimidating a Witness by Threat. FBI agents arrested STOLL the next morning.

26.     In a Mirandized post-arrest interview, STOLL said that he has several social media accounts, including on Clapper, Youtube, and TikTok. STOLL said he is a social-media influencer who reports the news.

7

27.     STOLL also said during the interview that he had received negative feedback and threats from other users online. STOLL said that the commenters had done enough to let him know that they knew who he was and where he lived, which he interpreted as a threat to himself. STOLL asserted that he had been dealing with "haters" for some time and that he had blocked "the same people 100 times" because "trolls" had continuously harassed him online.

28.     STOLL told agents that he did not enter the Capitol Building on January 6, 2021.

**G.     The SUBJECT ACCOUNT is associated with STOLL's phone number and his persona "Th3RealHuckleberry."**

29.     I subpoenaed Facebook for information about any accounts associated with account identifier "Th3RealHuck." Facebook provided records about a Facebook account with account identifier "th3realhuck," vanity name "Th3RealHuck," and display name "Huck You" (the **SUBJECT ACCOUNT**). The Facebook user ID for the **SUBJECT ACCOUNT** is 100055863441069. The records show that the account was created on October 6, 2020.

30.     The Facebook records show that the verified cell phone associated with the **SUBJECT ACCOUNT** is XXX-XXX-2007.[1] I believe that this is a phone number used by STOLL, because when agents searched STOLL's residence, they seized his phone. A forensic analysis of that phone showed that the phone number associated with it was the same number, XXX-XXX-2007.

31.     Additionally, the forensic analysis of the phone showed that it received a text on October 6, 2020—the day the **SUBJECT ACCOUNT** was created—that said, "FB-90733 is ThReal's Facebook confirmation code." Moments later, the phone received another text that said, "Confirmed! To edit SMS preferences go to m.facebook.com/settings. To turn off SMS for

---

[1] The Facebook records list the full number; however, I have redacted it here for privacy reasons.

your Facebook account on this mobile number reply stop. Reply help for other options. SMS charges may apply." Based on my training and experience, I believe that these two texts were sent to the phone by Facebook when the user of the phone created the **SUBJECT ACCOUNT**.

32.     Based on STOLL's statement to law enforcement that he is a social media influencer and has been dealing with "haters" online for some time; the evidence that he made threats using Clapper, another social media platform; the evidence linking the **SUBJECT ACCOUNT** to STOLL's phone number and his persona "Th3RealHuckleberry"; and the information I describe below about Facebook's retention of information, there is probable cause to believe that the **SUBJECT ACCOUNT** contains evidence of violations of 18 U.S.C. §§ 875(c) (Interstate Threats) and 1512(b)(3) (Intimidating a Witness by Threat) by STOLL. I believe that the **SUBJECT ACCOUNT** likely contains, among other things described in Attachment B, evidence showing whether STOLL did, in fact, enter the Capitol building on January 6, 2021 (which would be relevant to his motive for threatening the witness), as well as further evidence of STOLL's communications with and about the social media user with screen name "rstyree."

33.     On March 18, 2021, I submitted a preservation request to Facebook, asking Facebook to preserve records relating to the **SUBJECT ACCOUNT** for 90 days.

## BACKGROUND ON FACEBOOK

34.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

9

35.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

36.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

10

available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

39. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

40. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call. In this case, evidence from Facebook may show that STOLL was communicating with other co-conspirators about plans to breach the Capitol on

11

January 6, 2021; that he was communicating with the victim of the threat under investigation; or that he was communicating with others about the threat or his motivation for making it.

41.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

46.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

47.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP

address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so. In this case, evidence showing where STOLL was at the time he was using Facebook may show that he was using the application while inside the Capitol building on January 6, 2021.

48.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and

13

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement). In this case, I am aware of media reports stating that many rioters who participated in the January 6, 2021, riot deleted posts from their social media in an attempt to evade prosecution.

50.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

14

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

51.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

52.     Based on the foregoing, I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

56.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____

CALEB YOKLEY
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me in accordance with Federal Rule of Criminal Procedure 4.1 on March ____19_____, 2021.


_____

HON. STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID

100055863441069 that is stored at premises owned, maintained, controlled, or operated by

Facebook Inc., a company headquartered in Menlo Park, California.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

I.     **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on **March 18, 2021**, Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities **from October 6, 2020, through January 15, 2021**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from October 6, 2020, through January 15, 2021**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user **from October 6, 2020, through January 15, 2021**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information **from October 6, 2020, through January 15, 2021**;

(h)     All IP logs, including all records of the IP addresses that logged into the account **from October 6, 2020, through January 15, 2021**;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account **from October 6, 2020, through January 15, 2021**;

(m)     All information about the user's access and use of Facebook Marketplace **from October 6, 2020, through January 15, 2021**;

2

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

**14 days** of issuance of this warrant.

3

**II.**     **Information to be seized by the government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 875(c) (Interstate Threats) and 1512(b)(3) (Intimidating a Witness by Threat) involving JUSTIN STOLL on or about January 7, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence relating to threats by JUSTIN STOLL;

(b) Communications between STOLL and the individual who was using the username "rstyree" on Clapper as of on or about January 7, 2021;

(c) Evidence relating to JUSTIN STOLL's whereabouts and activities from January 1, 2021, through January 15, 2021, including preparations to go to the U.S. Capitol and travel and activities relating to the threat made by STOLL on or about January 7, 2021;

(d) Evidence relating to any other social media accounts, passwords, or monikers used by JUSTIN STOLL;

(e) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(f) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(g) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(h) The identity of the person(s) who communicated with the user ID about matters relating to activities at the U.S. Capitol Building on or about January 6, 2021.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.